```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
 2                      Charlottesville Division

 3   UNITED STATES OF AMERICA,            Criminal No. 3:18cr00025

 4              Plaintiff,

 5         vs.                            Charlottesville, Virginia

 6   BENJAMIN DRAKE DALEY, et al,
                                          11:05 a.m.
 7              Defendants.               April 22, 2019

 8

 9                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE NORMAN K. MOON
10              UNITED STATES SENIOR DISTRICT JUDGE

     APPEARANCES:
11
     For the United States:        JUSTIN M. LUGAR
12                                 THOMAS T. CULLEN
                                   U.S. Attorneys Office
13                                 310 First St. SW, Suite 906
                                   Roanoke VA 24011
14
                                   CHRISTOPHER R. KAVANAUGH
15                                 U.S. Attorneys Office
                                   255 W. Main St.  Room 130
16                                 Charlottesville VA 22902

17   For Deft. Daley:              LISA M. LORISH
                                   FREDERICK T. HEBLICH, JR.
18                                 FPD Office
                                   401 E. Market St.
19                                 Suite 106
                                   Charlottesville VA 22902
20
     For Deft. Gillen:             DAVID A. EUSTIS
21                                 Eustis & Graham PC
                                   P.O. Box 2195
22                                 Charlottesville VA 22902

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

```
 1   APPEARANCES (Cont'd):

 2   For Deft. Miselis:            WARREN E. COX
                                   CoxFedLaw, LLC
 3                                 422 1st Street
                                   Shenandoah VA 22849
 4
     Court Reporter:               Sonia Ferris, RPR, OCR
 5                                 U.S. Court Reporter
                                   116 N. Main St.  Room 314
 6                                 Harrisonburg, VA 22802
                                   540.434.3181.  Ext. 7
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1            THE COURT:  Good morning.

2            Call the case.

3            THE CLERK:  Yes, Your Honor.

4            This is Criminal Action No. 3:18cr25, United States

5   of America vs. Benjamin Drake Daley, Michael Paul Miselis,

6   and Thomas Walter Gillen.

7            THE COURT:  Government ready?

8            MR. LUGAR:  Yes, Your Honor.

9            THE COURT:  Defendants ready?

10           MS. LORISH:  Yes, Your Honor.

11           MR. HEBLICH:  Yes, Your Honor.

12           MR. COX:  Yes, Your Honor.

13           MR. EUSTIS:  Yes, Your Honor.

14           THE COURT:  Who is going to argue first for the

15  defendants?

16           MS. LORISH:  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MS. LORISH:  I'm going to have some initial words and

19  then counsel for Mr. Gillen will also have a few things to

20  say, and possibly also counsel for Mr. Miselis.  Thank you.

21           Lisa Lorish on behalf of Mr. Daley.

22           Mr. Daley and his co-defendants traveled from

23  California to Virginia with the intent to attend the Unite

24  the Right rally.  This was a lawfully permitted event.

25  Although it was certain to be controversial and draw
```

1    counter-protestors, it was not advertised as a riot in either

2    the generic or statutory sense.  A court -- this court, in

3    fact -- reviewed the plans for that rally in advance and

4    allowed it to proceed as planned.

5          A lawful protest that turns confrontational, and the

6    federal government responds by indicting people under an

7    Anti-Riot Act.  Challenges follow under the First Amendment.

8    That describes what happened at the inauguration of President

9    Trump.  The United States Attorneys office for the District

10   of Columbia responded by charging more than 200 protesters

11   under the D.C. Riot Act.  Almost all of those cases were

12   later dismissed.  It also describes the present case.  If we

13   watch the headlines, it will no doubt describe what happens

14   in South Dakota where the legislature there just passed an

15   anti-riot bill last month in response to protests over the

16   Keystone xl pipeline.

17         Of course, we're here today on these defendants'

18   motion to dismiss the indictment for failing to state a

19   claim.  As the Court knows, the parties have exchanged

20   voluminous briefs in advance, and I'm not going to repeat

21   those arguments all for you today.

22         Mr. Daley has made two fundamental challenges to the

23   indictment.  First, that neither count was pled adequately.

24   And second, that the Anti-Riot Act is unconstitutional on its

25   face because of its overbreadth, its vagueness, and its

```
1    infringement on protected First Amendment rights.  Central to
2    both of these arguments is the definition of riot.  It's a
3    definition the indictment omits entirely.  There is no
4    factual allegations that describe the riot that is central to
5    what the government has alleged, and, at best, the indictment
6    simply alleges Mr. Daley and his co-defendants traveled here
7    expecting violence may occur and that some violence did
8    occur.  While the government wants this case to be about
9    violence --
10         THE COURT:  The government will have to prove it.
11   It's not what they want or anything.  The government has to
12   prove their intent, doesn't it?
13         MS. LORISH:  They have to prove intent under the
14   statute -- that there was an intent to travel, an intent to
15   commit, at some point, some overt act.  And the way the
16   indictment is pled, they haven't specified, with respect to
17   any of these defendants -- they've specified that it was
18   travel versus other use of commercial means, but they haven't
19   specified if there was a riot, if this was an attempted riot.
20   They haven't specified if they traveled with the intent to
21   promote a riot, to actually engage in a riot, to incite a
22   riot.  Because of the overbreadth of the statute and the fact
23   that they haven't specified, there's two problems.  One, how
24   it's pled; and two, no matter how it's pled, it's facially
25   overbroad and comes up against protected First Amendment
```

```
 1   rights.
 2          The government's response in its brief so far has
 3   been to say this isn't about First Amendment speech, it's not
 4   about protected activities -- it's about violence.  But
 5   violence is just one small way this Act can cover what
 6   happens at a riot or at an alleged riot.  You only have to
 7   travel with the requisite intent for the statute to be
 8   brought, and you can travel with the requisite intent to just
 9   promote, to encourage, to aid and abet others in promoting
10   and encouraging.  So that's why the government's typical
11   response in this case -- that it's just about violence -- is
12   inadequate.
13          I'm going to invite up my co-counsel to address some
14   issues with respect to overbreadth and anything else that
15   counsel for Mr. Gillen would like to bring up.
16          Thank you.
17          MR. EUSTIS:  Thank you, Your Honor.  May it please
18   the Court.
19          I'd like to address a couple of aspects specifically
20   of the due process or notice issue that we see and as that
21   relates to overbreadth, so it washes back a little bit
22   between the Riot Act and the indictment itself.
23          The government, in its response, under Holder and
24   under Hoffman Estates, places a great deal of emphasis on the
25   distinction between an on-the-face or facial challenge to
```

1    constitutionality and an as applied challenge.  The argument

2    is made that, essentially -- and the government is correct in

3    that a facial challenge asks the question whether a statute

4    is impermissibly vague in all of its applications.  In such a

5    challenge, facial challenge, if the defendant's conduct --

6    this is cited primarily by the government -- if a defendant's

7    conduct is clearly described, then the defendant cannot

8    challenge the statute as void for other hypothetical

9    individuals or hypothetical cases.  We think this goes to the

10   very heart of one of the many problems with the Riot Act and

11   with the statute, and that is, specifically, here, when the

12   indictment, as in this case, does not notify us,

13   specifically, of the conduct that we engaged in that is

14   allegedly prescribed, we are then, even under the

15   government's argument, at once free to make hypothetical

16   arguments and raise hypothetical scenarios, and we're also

17   extremely limited in our ability to raise an as applied

18   challenge because we have extraordinarily little --

19   extraordinarily few specific allegations that go to the

20   intent that Your Honor raised that the government would have

21   to prove.

22        Under the Dellinger case -- that's a Seventh Circuit

23   1972 -- and I'll return to this in just a few moments -- the

24   defendants were specifically charged with making certain

25   speeches for the purpose of inciting, promoting, and

1    encouraging a riot after having traveled in interstate

2    commerce with intent to do so.  This is the reason -- that's

3    from Dellinger.  This is the reason we have the -- must have

4    statutory language in an indictment -- this is under Hamling,

5    as cited in the briefs -- that indicates the indictment must

6    be accompanied, other than just statutory language, with such

7    a statement of facts and circumstances as will inform the

8    accused of the specific offenses or offense for which he is

9    charged.  So I want to take a couple minutes, Judge, and just

10   look at the indictment before the Court in terms of specific

11   allegations.

12          The first six paragraphs allege membership in Rise

13   Above Missouri, and some description of that, though not very

14   much.  Then there are allegations, again, in the first six

15   paragraphs that the members hold racist nationalist and anti-

16   Semitic viewpoints.  The government may argue that,

17   allegedly, that could undergird shared viewpoints supporting

18   a conspiracy, but in terms of what these defendants did, it

19   doesn't tell us very much.  Certainly, beliefs cannot violate

20   the Riot Act.

21          THE COURT:  When you get down to paragraph nine under

22   Count 1, that starts telling you what they are accused of

23   doing.

24          MR. EUSTIS:  Yes; I wouldn't disagree with that,

25   Judge.  Absolutely.

```
1              After the first six, we have the statutory language.

2     Then we have the allegation that they rented a van in

3     California to drive north to Berkeley, California.  Then

4     next, they purchased flight tickets to Charlottesville from

5     California, and they did, in fact, fly from California to

6     Charlottesville.  Then we have they bought athletic tape and

7     baseball helmets in Albemarle County on August 11th, I

8     believe.  Then the allegation that on August 12, one or more

9     of them did wrap their hands in athletic tape.

10             Now, the Court does not have evidence before it, as

11    has been pointed out -- just the indictment.  But since it's

12    referred to in the indictment, I feel free to say at no time

13    on August 11 or 12 was any of these defendants wearing a

14    baseball helmet.  I don't know that they were ever observed

15    with baseball helmets.  What the government's allegation is

16    and the evidence is, they have the point of purchase on

17    August 11 in Albemarle --

18             THE COURT:  That's the facts the government has to

19    prove its case.  The question is what has been alleged in the

20    indictment, isn't it?

21             MR. EUSTIS:  Yes, it certainly is, but these are the

22    allegations that we have -- alleged facts.  To make an as

23    applied challenge to the statute or to the indictment, we

24    have to work off what facts we have that are alleged.

25             THE COURT:  I thought you were telling me there was
```

1    no evidence they did something.

2            MR. EUSTIS:  Specifically, with regard to that, no.

3            The indictment is correct.  They did purchase

4    baseball helmets in Albemarle County, but that then becomes

5    evidence of them of intent to riot.  Meanwhile, I'm just

6    pointing out that none of these defendants was ever seen with

7    a baseball helmet.

8            THE COURT:  I don't think that -- I don't know why

9    you're bringing in the facts at this point.

10           MR. EUSTIS:  I would agree that is outside the

11   indictment, Judge.  That's why I said I feel free to mention

12   it, and perhaps I should not have.

13           THE COURT:  When you get off on those tangents, it

14   sort of weakens your argument when you bring in things that

15   have nothing to do with the issue before the court.

16           MR. EUSTIS:  Thank you, Your Honor.

17           Finally, the indictment does allege these defendants

18   were prepared to and engaged in acts of violence and the

19   reference is to all four named defendants.  No one is

20   specifically singled out.  It's all four defendants, and the

21   acts of violence refer to Huntington Beach, Berkeley and

22   Charlottesville, all three.  So the indictment does not

23   allege, for instance, that Tom Gillen, individually, engaged

24   in an act of violence, or Tom Gillen by himself or in concert

25   with others in a particular place, whether it be Huntington

1    Beach, Berkeley or Charlottesville.  We're not put on notice.

2    It would be our position that not all of the defendants

3    engaged in acts of violence in all three locations, but it is

4    not spliced out.

5         Just before I make a final point, Judge, I would note

6    that the indictment in referring to acts of violence does not

7    say whether those acts of violence were justified or

8    unlawful.  It's not pled.  Was an act of violence an assault

9    or was it an act of self-defense or an offense of others?

10   The indictment doesn't say.  It simply says acts of violence,

11   which ordinarily -- I shouldn't say ordinarily -- generally,

12   is not a criminal offense.

13        If I may take just one moment, Judge, to contrast the

14   facts we're given in this indictment, the allegations that

15   are supposed to lead us to believe these defendants, or Tom

16   Gillen in particular, caused a riot or intended to incite

17   others to riot, where that riot occurred, if one did occur --

18   and we're in agreement a person does not have to actually

19   engage in a riot, arguably, to violate the statute, but if

20   there was one, when did it occur?  What did the acts of

21   violence result in?  Did it result in a riot?  If so, where

22   and when?

23        Let me take a brief couple of moments, Judge, to

24   refer to the Chicago Eight -- and this is the Dellinger case.

25   The September 1968 grand jury -- and this is just in small

1    part -- alleges with regard to the Chicago Eight or Chicago

2    Seven, as the case may be, It was further part of said

3    conspiracy that on a certain date the defendants and other

4    co-conspirators not named as defendants herein would make

5    statements and speeches to assemblages of persons encouraging

6    them to remain in and hold Lincoln Park against police

7    efforts to clear it after permits to remain therein had been

8    denied; to march to the international amphitheater after

9    permits authorizing such march had been denied; to make

10   weapons to be used against the police; to shout obscenities

11   at, throw objects, threaten and physically assault policemen

12   and National Guard troops; and to obstruct traffic; and

13   damage and seize property in the city of Chicago.

14          One final paragraph, paragraph eight of the

15   indictment.  It was further part of said conspiracy that

16   certain defendants would teach and demonstrate to others the

17   use, application, and the making of an incendiary device,

18   intending that said incendiary device would be employed to

19   damage the underground garage at Grant Park, Chicago,

20   Illinois, on the evening of August 29, 1968.

21          So that specific pleading, assaulting policemen and

22   National Guards troops, is going to be a violation of the

23   law.  No such thing is pled in the indictment before the

24   court.  So to the extent we can raise an as applied challenge

25   to these defendants' conduct, I'm happy to do so.  We didn't

1    do so in the brief.  It was a facial vagueness challenge, by

2    and large, but I'm happy to make that argument now.  We have

3    a van rented, air travel, baseball helmets purchased, tape

4    purchased and worn, attendance at four rallies, and engaged

5    in acts of violence.  That's what we're left with to make an

6    applied challenge.  The majority in Dellinger makes clear

7    that the doctrine of overbreadth applies when a statute lends

8    itself to a substantial number of impermissible applications

9    such that it is capable of deterring -- such that it is

10   capable of deterring protected conduct.

11          One area, specifically -- and I'll close with this,

12   Judge -- that we have is something that may not have been

13   contemplated by the Riot Act, and that is the so-called

14   heckler's veto.  That is a situation where there is, unlike

15   in the Chicago Eight -- where there is a lawfully permitted

16   rally, and the rally members, who have the permit, know,

17   because it is pre-announced for many months, and there's even

18   litigation over it, that there's going to be the presence of

19   a determined adversary, and that determined adversary has

20   engaged in violence in the past.  The city of Charlottesville

21   expressed grave concerns, including before this court, prior

22   to August 12 that violence would be anticipated, and asked

23   the court to take certain action as a result of that.  It was

24   heavily in the press -- all of this -- and under those

25   circumstances, someone who wants to attend that rally and

```
1    exercise rights of assembly and rights of speech might take

2    certain steps to protect themselves, as hundreds of people

3    did on August 12.  Without getting into too much of the

4    facts, Judge -- body armor, shields, rifles, helmets.  In

5    this case, evidence, just on the indictment, the defendants,

6    not in the city of Charlottesville -- in Albemarle County,

7    two days before -- they purchased baseball helmets.  That's

8    the government's evidence.  So they got a receipt.  That's

9    the baseball helmet evidence.  And, of course, we have the

10   tape and the wearing of the tape.  That is what we're left

11   with to defend against.  Then, buying baseball helmets and

12   buying tape becomes evidence of a pre-agreed intent to riot.

13   Indeed, an intent formed somewhere --

14          THE COURT:  It may not prove the intent, but they --

15   we're not dealing with proof right at this point.  Is the

16   indictment --

17          MR. EUSTIS:  On its face, our position is it is vague

18   and does not put us on notice as to what Mr. Gillen did in

19   Charlottesville, Berkeley or Huntington Beach, that violated

20   any law anywhere, other than potentially this law.  And what

21   did we do to encourage or incite others to riot?  That's not

22   pled.  That's why I read the Dellinger indictment.  That

23   specifically stated what a defendant or defendants did in the

24   indictment, and we don't have that.  The strongest thing in

25   the indictment is acts of violence.  Well, as the Court
```

1   knows, self-defense can be extremely violent.  Whether it was

2   self-defense, it's our position that the state judicial

3   system has been very effective in sorting out in particular

4   instances of assault and batteries and this sort of thing as

5   to whether something is just violent or a crime.  They've

6   been able to do that, and now we're placed in a position

7   where we have a heckler's veto, and there's evidence that

8   they took this small step and that small step, and that's

9   then evidence on the face of the indictment, and we're

10  supposed to defend against those allegations, without

11  further.  And it essentially doesn't charge a crime, other

12  than the fact that, clearly, the Anti-Riot Act is a criminal

13  offense.  We would have to concede that.  But looking at the

14  indictment, it doesn't appear to charge a crime, other than

15  vague violation of the Anti-Riot Act, which is begging the

16  question as to what crime that is as applied to these

17  defendants' behavior.  We're not able to answer that.  We're

18  not able to respond to it, and that's why our position is the

19  indictment is fatally flawed under noticing provisions.  We

20  need more than this.

21      The government may say, We've given you more facts

22  than we need to, and I would absolutely agree with that.  But

23  they haven't given us the right ones.

24      Thank you, Judge.

25      MR. COX:  May it please the Court.  I'll be very

1     brief.  I don't want to rehash the arguments of my co-counsel

2     or briefs filed in this case, but I do want to address the

3     word "riot."  Riot was alleged in the indictment, but just

4     that term.  Riot is a word that has a public -- has a meaning

5     that a person of average intelligence attributes to it, which

6     is, basically, violence in a crowd.  Well, the term riot has

7     a legal meaning, and it is, you know, an element of this

8     offense, and that term, as legally defined, is a threat or

9     threats of commission, acts of violence by one or more

10    persons as part of an assemblage of three or more persons.

11         Nowhere in the indictment is that term defined, and

12    we believe it's absolutely necessary for that term to have

13    been defined in the indictment and for the grand jury to have

14    considered because this term, riot, while does have, again, a

15    common understanding, that common understanding differs from

16    the legal definition.  So both, you know, the defendants and,

17    indeed, the grand jury did not have that legal definition

18    before them.  So it's uncertain as to what they actually

19    believe that term to include.  So we believe for that

20    reason --

21         THE COURT:  Looks like the grand jury could always be

22    ignorant of what they're doing and not know the real

23    definition of anything.

24         MR. COX:  Well, Your Honor, the important thing,

25    though, is that the indictment not only fails to define that

```
 1    term, but, you know, the government has argued that they
 2    just, you know, didn't recite the elements of the offense,
 3    that they alleged facts to underlie the charges in the
 4    indictment.  But nowhere in their facts do they really
 5    explain what both the legal definition of riot is and how the
 6    facts that they allege pertain to that legal definition.  So,
 7    you know, my client, Mr. Miselis -- he's not really under
 8    notice, you know, that a riot occurred and when it occurred.
 9    All he's under notice is that he's alleged to have committed
10    violence or incited violence at some point during those two
11    days in Charlottesville.  So he's not really received any
12    notice at all as to what the riot was, when it occurred and
13    so on.  So we believe that was necessary in the indictment to
14    give him notice.
15            Thank you, Your Honor.
16            THE COURT:  Thank you.
17            MS. LORISH:  Thank you, Your Honor.
18            So I think counsel for Mr. Miselis and Mr. Gillen
19    have set forth the first aspect of the argument, which has to
20    do with whether the indictment sufficiently pleads the two
21    offenses.  We would just note the majority of the argument
22    laid out in the briefing here is just that we have a
23    parroting of statutory language and insufficient detail, and
24    leave it to the court to determine whether you agree with
25    that.
```

```
 1            I want to focus now on just over-viewing the other
 2   challenges, which are more significant, because no matter how
 3   the indictment would plead these offenses, we have the
 4   problem that the statute, the Anti-Riot act, is
 5   unconstitutional.  As we've set forth in the briefing, and I
 6   won't belabor it here this morning, it's unconstitutional
 7   because of vagueness.  Every application -- it doesn't have
 8   to be an as applied challenge here -- facially vague because
 9   of three things.  The fact that the definition of riot that
10   my counsel here has discussed is vague.  It requires a court
11   to assess lots of -- how clear and present is a danger and
12   how do we know what is and isn't a riot.  There's an inherent
13   vagueness in that definition.  There's the problem of
14   attenuation, that the travel with a certain intent can happen
15   at any point before an actual overt act happens later in the
16   future.  So that adds an additional attenuation and
17   vagueness.  And, finally, because the statute itself directly
18   covers and criminalizes promotion, encouragement,
19   participation in speech -- acts of speech and expression --
20   but at the same time tries to carve out what we don't really
21   mean to say, advocacy of ideas or expression of belief, if it
22   doesn't have to do with violence -- the fact there's sort of
23   an overt attempt to carve out certain parts of speech, but
24   it's unclear what it really means, and none of it meets the
25   Brandenburg test from the Supreme Court, which, of course,
```

1  came out after this Act was passed, which requires if we're

2  going to verge on incitement, if we're going to try to

3  criminalize speech, incitement language, you have to have

4  intent, imminence, and likelihood.  The statute doesn't

5  require anything but intent.  We have the intent part

6  covered.  We agree the statute requires the defendant to have

7  the requisite intent.  But there's nothing that requires an

8  imminence of violence.  Somebody could put a handbill in the

9  mail, as the Seventh Circuit noted in Dellinger, and that

10 bill could argue that people should really go out and cause

11 some violence, and the person who sent the bill in the mail

12 may really want them to go and cause violence.  But there's

13 no imminence.  We never know if anyone gets that handbill in

14 the mail.  We never know if anyone feels that the person who

15 wrote it was intelligent and had a good argument.  There's no

16 imminence.  There's no likelihood, which is related.  Did the

17 acts, did the incitement, did the speech we're talking about

18 here -- was it likely to actually cause violence?  The

19 Anti-Riot Act does not require any of those things on its

20 face.  That's what takes it in direct contradiction with

21 Brandenburg.  Whenever we have a speech problem where we come

22 up against speech, we have to use higher standards, which is

23 why the overbreadth argument has an extra bite in this case.

24 That's why the vagueness argument has to be taken all the

25 more seriously.  They're two separate arguments, to be clear,

```
 1    as they've been set forth.  The United States v. Williams

 2    case that's discussed at length in the reply talks about the

 3    overbreadth issue, that a statute is "facially invalid if it

 4    prohibits a substantial amount of protected speech."

 5           That's what we have here.  There are so many ways to

 6    violate the statute that have nothing to do with violence,

 7    that just have to do with speaking, without any requirement

 8    that the speaking actually be heard, be listened to, be

 9    imminent or likely, and that's what causes the overall

10    problem in this case.

11           I'll just note that the Dellinger case, the one the

12    government relies on, and, of course, we rely on it as well

13    because it's the only case that really examines the statute

14    in any detail, and it's a case that's, as this Court knows,

15    over 40 years old.  That case read its way around this

16    problem in a way that I have suggested this court cannot

17    follow.  The way the Seventh Circuit got around the problem

18    in this statute is to say overt act doesn't mean overt act.

19    It means a completed act.  So when the statute says whoever

20    travels in interstate commerce to incite a riot and then

21    actually takes an overt act towards inciting a riot, that

22    means they actually did it.  They didn't just take some small

23    step.  They actually incited the riot or they actually

24    promoted the riot.

25           THE COURT:  An overt act doesn't necessarily mean the
```

1    riot --

2          MS. LORISH:  I'm sorry, Your Honor?

3          THE COURT:  An overt act would not necessarily mean

4    the riot occurred.

5          MS. LORISH:  That's right, and that's where the

6    problem is.  The Seventh Circuit found other ways to overturn

7    all the convictions in that case without having to find this

8    act unconstitutional.  But the reason it said it could find

9    it --

10         THE COURT:  In this particular case, the indictment

11   charges that they made the plans -- they had the intent in

12   California, and amongst the three of them, they conspired.

13   But they were not going to do anything illegal until they got

14   to Charlottesville, and that's when they would encourage and

15   so forth the riot.

16         MS. LORISH:  Right.  But the problem with the

17   statute, Your Honor, as we suggested, is that the statute

18   criminalizes -- yes, having the intent to travel, so in this

19   case, that would be the intent formed in California to travel

20   to Charlottesville.  Then it criminalizes not just the intent

21   but any overt act towards one of the four listed things.

22         THE COURT:  But there would be no particular time gap

23   between the inspiring of the riot and the riot.  The

24   allegation is not that they inspired the riot when they were

25   in California.  I think separation for the riot is to occur

1    when they get to Emancipation Park or the rotunda or

2    whatever.

3            MS. LORISH:  I think that is a possible set of facts

4    the government could try to prove at the trial, Your Honor,

5    but --

6            THE COURT:  Isn't it in the allegation?

7            MS. LORISH:  Well, Your Honor -- I have a copy of the

8    indictment here.

9            So with respect to the conspiracy --

10           THE COURT:  With respect to other people, they were

11   not going to do anything -- the speech would come at the riot

12   or at the gathering, which was to become the riot.

13           MS. LORISH:  Well -- so, first, with respect to the

14   law, Your Honor, this is a facial challenge.  The specific

15   facts of when the travel happened versus the speech in this

16   case don't implicate whether the statute is overbroad because

17   the statute doesn't require that someone say, I'm going to

18   travel today and then go make a speech tonight.  It could be

19   that you traveled six months before you ever make a speech.

20   We see some of the attenuation problem even in the specific

21   facts pled in this indictment because the conspiracy is

22   alleged to have started back in March, six months before we

23   ever get to August.  We're talking about events and things

24   that they said and did in the six months leading up to the

25   supposed riot.

1          With respect to Your Honor's question about, well,

2    it's about -- it was only when they got to Charlottesville

3    that they incited the riot -- this indictment doesn't tell

4    us, Your Honor, if they're accused of inciting a riot.  We

5    just have a copy of the language in both paragraphs nine,

6    with respect to the conspiracy, and then, again, in paragraph

7    13.  All four options from the statute are included.  They're

8    accused of having taken some overt act towards either

9    inciting a riot, or organizing, promoting, encouraging,

10   participating in, or committing an act of violence in

11   furtherance, or aiding and abetting any person in inciting or

12   participating, which goes back to what the other counsel were

13   suggesting with respect to the difficulty in inferring what

14   the government has actually alleged here.  If they had done a

15   simple indictment that says they're charged with traveling

16   with the intent to incite a riot and then they got to

17   Charlottesville and incited a riot, we would at least know

18   the aspect of the constitutional challenge we'd be making in

19   an as applied challenge at this point.  But because it's been

20   pled under the entire statute, that is part of why we're

21   making the facial overbreadth challenge and the facial

22   vagueness challenge at this time.

23          If there's no further questions from the Court at

24   this time, I'll let the government respond.

25          THE COURT:  All right.

1           MR. LUGAR:  Good morning, Your Honor.  May it please

2    the Court.  Justin Lugar for the United States.

3           Your Honor, just by way of introduction, we all know

4    we're here today not because these defendants came to

5    Charlottesville to peacefully demonstrate or express their

6    views nonviolently.  These defendants are here because they

7    came to Charlottesville to, in their own words, "smash

8    Commies," and because they openly bragged they were the only

9    Alt Right crew that could actually "beat Antifa senseless and

10   wins rallies."  These defendants never sought to win hearts

11   and minds through the peaceful protected speech and actions.

12   Their own words and violent actions led them to where they

13   sit today.

14          We can all agree -- I think we all do agree that the

15   First Amendment is essential to our constitutional

16   foundations, but it's not without its limits.  Defendants

17   here blow past these limits, and that's the sort of abhorrent

18   conduct the Anti-Riot Act prohibits.  Since they cannot, on

19   the facts of this case, prevail, they challenge the

20   constitutionality of the Act and claim the indictment is

21   insufficient.  Each of these challenges fails, however.

22          First, the indictment is sufficient.  You've heard

23   the defendant say today it just put them on notice.  That's

24   the legal standard.  It must put them on notice.  They

25   complain about definitions and the listing of the elements,

 1    but that's all that's required by law.

 2         Second, the Act does not violate the First Amendment

 3    and is not overbroad in any way.  The statutory language

 4    tells us so and every court to ever address this issue has

 5    found the Act to pass constitutional muster, and I'll get

 6    into those particular statutory provisions in just a minute.

 7         Thirdly, the Act is not vague under the Fifth

 8    Amendment due process clause either.  There is a host of

 9    defined terms in the statutory scheme, and defendants like

10    their insufficiency argument -- they just don't like the

11    definitions so they claim they're vague.  If the defendants

12    were right, then virtually every criminal statute would be

13    deemed vague under their defined terms.

14         So I want to jump straight into the sufficiency of

15    the indictment, which I think sort of colors the entirety of

16    the defense's argument here.  It's important to note first

17    that what the defendants are asking this court to do is to

18    rewrite a fundamental foundational principle of criminal law

19    and procedure to include definitions in every indictment.

20    That's just wrong.  The indictment need only put the

21    defendants on notice of the charges against them.  An

22    indictment need not set out legal definitions to be

23    sufficient, and we know that from the case in Hamling.

24    There, the Supreme Court found that the definition of

25    obscene, which may have a common meaning, as the defendants

1    say, and may have a legal meaning, that need not be included

2    in an indictment.  The same is true for riot and the other

3    defined terms in this statutory scheme.  In fact, there's

4    nothing unique about this indictment as opposed to any other

5    indictment this court deals with that include defined terms

6    through the statutory scheme that are not pled in the

7    indictment.  For instance, the definition of controlled

8    substance for cases under the Controlled Substance Act; the

9    definition of firearm or destructive device under 922.  The

10   same is true for the definition of sexually explicit conduct

11   for child exploitation cases.  Those are all terms of art

12   that may have a common meaning as well, but they're not

13   required to be pled in an indictment, and the Supreme Court

14   has made that very clear.

15        I also want to point out just briefly that in their

16   reply, the defense points to the case of Kingrea and Hooker.

17   I just want to clear up any misunderstanding about what that

18   case -- those cases may stand for.  The way the defendants

19   argue that case is to say that if you fail to plead this

20   definitional part in the indictment, which we contend and

21   what the Supreme Court has told us is not required, then you

22   can't subsequently charge a conspiracy and fail to outline

23   those essential elements of the underlying offense.  So,

24   really, it's inapplicable here.

25        If you look at the indictment itself, paragraph 13

```
 1    pleads all the elements of the substantive offense violating
 2    the Anti-Riot Act, and then the conspiracy charge at both
 3    paragraph nine and at paragraph ten lists the elements of the
 4    conspiracy, the elements of riot, and then it goes through
 5    the overt acts that we've alleged in furtherance of that
 6    conspiracy.  So we'd submit the indictment itself is
 7    sufficient on its face and what, really, the defendants are
 8    seeking here is they want more facts.  They want a Bill of
 9    Particulars.  They have a procedural mechanism to get the
10    specificity that they so desire.  They have not asked for it.
11    They've been provided with a wealth of discovery in this case
12    that outlines precisely the events that give rise to this
13    indictment.  So we contend that that's not really a serious
14    grounds to challenge the indictment.
15          Moving on to the more substantive issues, I'll look
16    first at the First Amendment.  As the defendants have said,
17    their First Amendment challenge is an overbreadth challenge,
18    which basically contends that the Anti-Riot Act substantially
19    burdens protected speech.  I would point out there are two
20    initial problems with their challenge.  First, the Act
21    doesn't itself burden any protected speech at all and
22    defendants can't point to a single hypothetical example of
23    the statute burdening protected speech.  The defendants want
24    this court to focus on the events in Charlottesville as a
25    political rally, hence their desire to get you to take
```

1    judicial notice of the permit allegations and what Judge

2    Conrad found in a related case.  They do that because

3    defendants here traveled to turn that supposed rally into a

4    riot, not because they accidentally stumbled into a peaceful

5    demonstration -- I'm sorry -- into a riot.  We submit it's

6    important to bear in mind that the Anti-Riot Act does not

7    criminalize or burden in any way at all peaceful expressions

8    of one's view, whether they're mainstream views, whether

9    they're considered Alt Right views, far left views, or

10   regardless of whether they're just patently abhorrent views

11   that not many people would agree with.

12          Second, there's a real irony in the defendants'

13   argument and its reply that the government asks this court to

14   be the first court in 45 years to uphold the

15   constitutionality of this Act under an overbroad standard.  I

16   think Ms. Lorish mentioned it as well in her closing

17   statements there, but we'd submit the very fact the Anti-Riot

18   Act is so rarely employed by the United States that it

19   evidences it's not overbroad, because the hallmark of

20   overbreadth, from a constitutional standpoint, is that you

21   have arbitrary enforcement and standardless application of

22   law.  Thus, one would expect to see the exact opposite of

23   what we see here, which is a narrow and rare use of the

24   specific statute.  We've been fortunate in our history since

25   the Vietnam era not to really have to deal with these sorts

1    of issues until at least in August of 2017 here in

2    Charlottesville.  So while the defendants try to paint their

3    behavior and speech as protected and some high ideals under

4    the First Amendment, they can't escape the fact that the

5    First Amendment does not immunize one from criminal

6    prosecution where you engage in unprotected speech or

7    expression, and that's exactly what is alleged here and the

8    Anti-Riot Act prohibits.

9         I point out the defendants really don't dig much into

10   the test at all or give much analysis of it.  So as the Court

11   is aware, to invalidate a statute on First Amendment grounds,

12   you have to show that it's protected speech and that if the

13   speech is protected, the burden on that speech must be

14   substantial.  Here, we contend that the speech at issue is

15   not even protected speech, much less burdened or even

16   substantially burdened.  We know this because the statute

17   tells us so.

18        I point the Court to Section 2102(b) where it

19   specifically excludes from the coverage of the statute "the

20   mere oral or written advocacy of ideas, or expression of

21   belief, not involving advocacy of any act or acts of violence

22   or assertion of the rightness of, or the right to commit, any

23   such act or acts."  If that statutory definition, that

24   carve-out, if you will, was not explicit enough, we know that

25   every court to ever deal with this issue has uniformly found

1    the statute does not cover protected speech at all.

2         In the Foran case, the court said Section 2101 does

3    not proscribe the peaceful exercise of the right of free

4    speech and assembly, only those acts that tend to the

5    incitement of violence that's imminent and likely.  Dellinger

6    told us the same thing.  Intentional incitement of violence

7    is not protected speech.  Again, in the Northern District of

8    California case, the Shead case, court there tells us that

9    the Anti-Riot Act is limited to the advocacy of the use of

10   force or of law violation where that advocacy is directed to

11   inciting or producing imminent lawless action and is likely

12   to produce such action.

13        Since the defendants can't legitimately argue the

14   statute burdens protected speech, they instead claim the

15   statute is overbroad and that the travel does not need to be

16   linked in time to the riot.  That's their, sort of,

17   attenuation line.  We submit this is a red herring.

18        First, the plain language and the structure of the

19   statute illustrate that there must be a connection between

20   the use of interstate commerce with the intent, and the overt

21   act with the intent.  If the language were not explicit

22   enough from the statute, we must bear in mind that there's

23   nothing unique about the statute and in general principles of

24   criminal law, intent must be connected to the overt act, and

25   you alluded to it in some of your questioning earlier, Your

 1    Honor.  The court in _Dellinger_ was right in stating that

 2    whether you call it a clear and present danger test or call

 3    it an imminent likelihood of violence, the nature and details

 4    of the riot contemplated at the time don't have to be exactly

 5    identical to those acts that give rise later.  All you have

 6    to do is have unlawful intent and the prohibited conduct

 7    coincide at some point.  And this is true for every criminal

 8    statute.  Intent must correspond with action, and what's what

 9    we've alleged in this indictment and what the Anti-Riot Act

10    actually requires.

11         So it's not really a matter of constitutional

12    overbreadth just because it happened in the First Amendment

13    context.  But it's a question for a jury to determine.  Was

14    the intent linked to the overt acts that we alleged?  That's

15    an issue in nearly every single criminal case, and there's

16    nothing new here to look at.

17         Your Honor, the defendants also argue the Anti-Riot

18    Act is vague under the due process clause.  Whether the court

19    views this as a facial challenge or an as applied challenge,

20    it really doesn't change the outcome because the Act is not

21    vague.

22         If the Court desires, I'm happy to go through the

23    _Holder_ analysis and explain why, but I think that's clear

24    from the statute itself.  I think the most important thing

25    for the Court is to look at the test for vagueness.  That

```
 1    test says that conviction fails to comport with due process
 2    only if the statute under which it obtained fails to provide
 3    a person of ordinary intelligence fair notice of what is
 4    prohibited, or when something that is so standardless that it
 5    authorizes or encourages seriously discriminatory
 6    enforcement.
 7             Here, we're not talking about statutory terms that
 8    lack definitions.  They're all specifically defined in 2102.
 9    We're not talking about terms that require untethered
10    subjective judgments without statutory definitions, narrowing
11    in context or set of legal meanings.  Here, we have statutory
12    definitions of the terms at issue:  riot, to incite a riot,
13    and to organize, promote, encourage or participate in and
14    carry on a riot.  In carefully defining these terms, Congress
15    did precisely what the due process clause requires.  It
16    provided the sort of narrowing in context envisioned in the
17    Williams case, which defendants mentioned as well, and what
18    the court envisioned, and it relies upon a set of legal
19    meanings and legal terms of art to define the boundaries of
20    the statutory scheme.  So since they can't really counter
21    this conclusion, in their reply, the defendants focus in on
22    clear and present danger test and they claim that the
23    Anti-Riot Act is vague because of the language relying on
24    clear and present danger.  But the court in Dellinger was
25    very clear that the court's analysis of the definition of
```

     riot and its reference to clear and present danger recognize

     exactly what the Anti-Riot Act requires vis-à-vis action, and

     can be expressed in many different ways with many different

     terms, all of which convey an intelligible and objective

     meaning, which is all that due process requires.

          So some of the different ways the Dellinger court

     explained that this test has been characterized -- it's been

     called the clear and present danger test.  It's been called a

     test that is directed to inciting and likely to incite

     imminent lawless action.  They look at whether the harm

     sought by an expression is immediate and instantaneous and

     irremediable except by punishing that expression and currying

     the conduct.  And they look at whether the expression is

     inseparably locked with the action.  So there can be little

     doubt that reference to clear and present danger and the

     definition of the Riot Act reflects congressional purpose in

     providing just the sort of narrowing context required under

     the due process test.

          Just briefly -- this didn't come up today, but just

     for purposes of the brief, I want to briefly address the

     defendants' reliance on recent cases from the Supreme Court

     that found terms to be vague.  That's the Johnson case and

     the Dimaya case, as I'm sure this Court is very familiar

     with.  I just want to point out that what the majority, and

     Justice Scalia, recognized in Johnson is that what was wrong

```
 1    with those statutes was that it required an abstract
 2    comparison between a hypothetical ordinary case as opposed to
 3    analysis of real world facts and statutory elements, and that
 4    created this sort of indeterminacy or vagueness that failed
 5    to give ordinary folks notice, and resulted in arbitrary
 6    enforcement.  What's important and what's left out of the
 7    defendants' argument is the fact that the majority also noted
 8    that as a general matter, we don't doubt the
 9    constitutionality of the laws that call for the application
10    of a qualitative standard such as substantial risk to real
11    world conduct.  The law is full of instances where a man's
12    fate depends on his estimating right some matter of degree.
13            What I would submit to the Court, Your Honor, is the
14    Anti-Riot Act and its statutory definitions that we've
15    discussed at length here today, and in our briefs, do not
16    invite, much less compel, this sort of judicially-imagined
17    ordinary case.  The Anti-Riot Act is a law that calls for the
18    application of a qualitative standard whether it's described
19    as speech that presents clear and present danger or speech
20    that is directed to incite and likely to incite imminent
21    lawless actions, as explained in Dellinger.  In short, the
22    rationale of Johnson and then, subsequently, Dimaya actually
23    support a finding that this statute, the Anti-Riot Act, is
24    not vague and is the opposite of vague.
25            So we've sort of come full circle, here, Your Honor.
```

1    The defendants' actions here fall far outside the bounds of

2    the First Amendment and they fall squarely within the

3    confines of the Anti-Riot Act, and that's for a jury to

4    determine whether or not the government can prove those

5    elements.  They've been sufficiently pled.

6          And I want to be clear about what the defendants are

7    really asking this court to do in their motion.  First,

8    they're asking this court to rewrite the fundamental

9    principle of criminal pleading, to require all defined terms

10   of statutory schemes to be pled in an indictment.  We know

11   that's just not the case from Hamling and from a host of

12   other issues this court deals with every day.

13         Second, they ask the court to find incitement to

14   violence and violence itself to be protected under the First

15   Amendment, and that's in spite a century of case law to the

16   contrary.

17         Third, they ask the court to find vagueness in the

18   statute where the defendant simply doesn't like the

19   congressionally-defined terms.  They're defined and they put

20   ordinary people on notice and I don't think that there's any

21   argument there that if you were to require that, every single

22   statute that has a term of art would have to be pled in the

23   indictment and wouldn't pass the constitutional test for

24   vagueness.

25         Finally, if that weren't enough -- and we didn't

```
 1    address this today.  I think the Court is fully aware of this

 2    situation.  But they ask the court to reexamine and then

 3    overturn, basically, a century of commerce clause

 4    jurisprudence, which I think they, wisely, didn't argue that

 5    here today.  But for all those reasons, Your Honor, we

 6    believe the Anti-Riot Act is more than constitutional under a

 7    First Amendment standard and a due process standard, and the

 8    indictment gives -- I mean, it gives incredible detail

 9    compared to many indictments.  If they want a Bill of

10    Particulars, they could have asked for one.

11          Unless the Court has any specific questions --

12          THE COURT:  No questions.  Thank you.

13          MR. LUGER:  Thank you.

14          MS. LORISH:  Just to be clear for the record, the

15    very clear, easy-to-understand definition that would be

16    apparent to any person the government has no problem with --

17    the definition of riot set forth in 18 U.S.C. 2102 -- that's

18    "a public disturbance involving either an act or acts of

19    violence by one or more persons part of an assemblage of

20    three or more persons, which act or acts shall constitute a

21    clear and present danger of, or results in, damage or injury

22    to the property of any other person or to the person of any

23    other individual; or a threat or threats of the commission of

24    an act or acts of violence by one or more persons part of an

25    assemblage of three or more persons having, individually or
```

collectively, the ability of immediate execution of such

threat or threats, where the performance of the threatened

act or acts of violence would constitute a clear and present

danger of, or would result in, damage or injury to the

property of any other person or to the person of any other

individuals."

The government's suggestion that we should take heart

that the statute is not so overbroad, it's not a problem

because it's rarely used -- I find to be unconvincing.

Overbreadth can go a selective prosecution in the rare case

as much as it could in the common case.  The fact that we

haven't seen prosecutions under this statute raises concerns.

It doesn't suggest and promote the idea that we should just

take heart that the government will only use it when they

really need to.  This is all covered extensively in the

briefing.

So the last thing I'll mention for today, Your Honor,

is that we focused a lot on travel with intent, and that's

because that's the only thing that's clearly pled about this

statute, frankly, in the indictment.  We know the government

has alleged these individuals traveled with the intent.  They

did not use the alternative in the statute, which was that

they could have been alleged to have used any facility of

interstate commerce, including but not limited to the mail,

telegraph, telephone, radio or television.  But for this

1   overbreadth challenge, which is a facial one -- for this

2   vagueness challenge, which is a facial one -- that second

3   part of subsection A is just as relevant, because my

4   colleague is correct.  We have to look at whether there's a

5   chilling effect from the statute.  Is the burden worth it?

6   When you include a statute that makes it a federal felony

7   offense to use the internet, to use the mail, to use the

8   radio, to promote, or to take any step towards promoting,

9   anything that might result in a riot -- which is what we have

10  here -- it does cover protected speech.

11        The government has failed to, really, address

12  Brandenburg at all today, for good reason.  Brandenburg

13  requires immediacy.  It requires a likelihood that violence

14  actually occurred, that these words are connected directly to

15  violent acts.  The statute does not require that.  I would

16  suggest the Court should not read in a requirement that's not

17  there because, again, this only requires an attempted overt

18  act.  You don't even have to have completed the overt act,

19  and some of these overt acts include just aiding or abetting

20  another person in their attempts to promote a riot.  So we're

21  so far way from an actual riot, in many instances; and,

22  again, we could just have someone saying something on the

23  internet and never even traveling, and that's part of the

24  overbreadth problem for the statute.

25        Thank you, Your Honor.

1          THE COURT:  Thank you.  Is that all then?

2          I'll let you know something in a few days.

3          We'll recess court.

4          (Proceedings concluded at 12:00 p.m.)

5

6

7

8

9

10

11

12    "I certify that the foregoing is a correct transcript from

13    the record of proceedings in the above-entitled matter.

14

15

16    /s/Sonia Ferris                    July 12, 2019"

17

18

19

20

21

22

23

24

25